UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Detrick Lockridge,

Plaintiff,

v.

Per Mar Security & Research Corp.,

Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-2894 (MJD/JJK)

_____

Michael A. Fondungallah, Fondungallah & Kigham LLC, Counsel for Plaintiff.

James B. Sherman and Chad A. Staul, Wessels Sherman Joerg Liszka Laverty Seneczko P.C., Counsel for Defendant.

_____

This matter is before the Court on Defendant's motion for summary judgment, and Plaintiff's motion to exclude the expert report of Suanne Grobe Ranheim.

## I.     Factual Background

Plaintiff was employed with Defendant Per Mar Security & Research Corp. ("Per Mar") from September 2005 through August 2011.  Plaintiff is African American.  Per Mar is a full-service security company.  It provides Wells Fargo Bank with physical security guard services in various locations, including

Shoreview, Minnesota and downtown Minneapolis (the "NOC" location).

Plaintiff was hired by Per Mar as a security officer, but in December 2005, he was

promoted to the position of Account Manager for the Wells Fargo NOC location.

After his promotion, he reported directly to the General Manager.  As Account

Manager, Plaintiff was responsible for following Per Mar's policies and

procedures, making hiring and firing recommendations, supervising security

officers at Wells Fargo NOC location, overseeing training of new officers and

supervisors, being on-call 24/7 and interacting with Wells Fargo client

representatives.

### A.    Claims of Sexual Harassment

In September 2010, a Per Mar Security Guard named Robert Johnson filed a

claim of sexual harassment against the Account Manager in the Shoreview

location, Debbra Helmbrecht.  Helmbrecht is white and Johnson is African

American.   Johnson alleged that Helmbrecht invaded his personal space by

touching his knee, arms, back and leg, and that he perceived this touching to be

sexual in nature.  (Zumdome Decl. ¶ 12.)  Human Resources Generalist Jodie

Mortenson initiated an investigation, and asked General Manager Harlan Austin

and HR/Payroll Specialist Tanisha Bradford to assist in the investigation.  (Id. ¶

11.)  In a letter dated October 11, 2010, Mortenson informed Johnson that an

investigation was conducted in which witnesses identified by Johnson and

Helmbrecht were interviewed.  (Fondungallah Decl. Ex. 9.)  Mortenson informed

Johnson that the investigation revealed that Johnson's specific allegations were

not substantiated, but that it was determined that Helmbrecht engaged in

conversations with Johnson that were against company policy, and that

"disciplinary action and training are in process."  (Id.)  Because Human

Resources Director Mindy Zumdome and Mortenson were not aware that

Johnson had expressed any fear for his personal safety and did not allege any

inappropriate sexual banter, they decided it was not necessary to suspend

Helmbrecht during the investigation.  (Zumdome Decl. ¶ 13.)

Two months later, in December 2010, Security Guard Cassandra Block

filed a sexual harassment complaint against Plaintiff.  (Id. ¶ 6.)  An investigation

was initiated Mortenson, and she was again assisted in the investigation by

Austin and Bradford.  (Id.; Staul Decl. Ex. C (Bradford Dep. at 64).)  Block

claimed that Plaintiff had squeezed her leg and engaged in repeated

inappropriate sexual discussions with her, such as asking whether she had ever

had an STD or whether she had ever been loved without being touched.

3

(Zumdome Decl. ¶ 7; Staul Decl. Ex. M.)  Block also reported that Plaintiff

repeatedly asked her if she wanted to be his roommate, would call her cell phone,

talk with her about his marriage and other personal topics, and would ask her to

dinner.  (Staul Decl. Exs. L, M.)  She further reported that she was in fear of her

personal safety at work from Plaintiff.  In an attachment to an email sent to

Bradford on December 12, 2010, Block wrote "The first thing I would like to

discuss is that since Per Mar cannot guarantee that I will not be in harm's way

(the same as Dedric on Monday) the day that I am scheduled to come in, what

does Per Mar/HR suggest that I do?  My main concern is for my safety and since I

know that Per Mar is also concerned about my safety, <u>I will wait to hear back

from Per Mar/HR on when I should return back to my job out of harm's way.</u>"

(<u>Id.</u> Ex. L.)  Based on the severity of Block's allegations and her explicit fear for

her safety, Zumdome and Mortenson decided to place Plaintiff on paid

administrative leave while an investigation was completed.  (Zumdome Decl. ¶

9.)

        The investigation into the sexual harassment complaint against Plaintiff

was inconclusive "due to [Plaintiff's] denial, denial made by the other named

employee, and lack of documentation." (Staul Decl. Ex. I.)  Plaintiff was allowed

to return to work after less than one full day suspension.  He did not lose any pay

or other benefits as a result of the suspension.  (Zumdome Decl. ¶ 10.)  Block was

transferred to another account, so when Plaintiff returned to work after his

suspension, he never saw her again.  (Fondungallah Decl. Ex. 3 (Plaintiff Dep. at

193).)

### B.    Claims of Race Discrimination

#### 1.    Ed Nolan

Ed Nolan is a Wells Fargo employee, and at the times relevant to this case,

was the person in charge of operations at the Wells Fargo NOC location where

Plaintiff also worked.  In this position, Nolan interacted with Plaintiff and other

security personnel.  (Staul Decl. Ex. G (Nolan Dep. at 8-9).)

In 2009 or 2010, Austin proposed to Nolan that a single account manager

oversee both the NOC and Shoreview locations, and suggested that Plaintiff take

that position.  (Id. Ex. A (Plaintiff Dep. at 144-45).)  At first, Nolan was on board

with the idea, but when he learned that Plaintiff would receive a pay raise, and

that he would be making more money than Nolan, Nolan told Plaintiff he was

not okay with Plaintiff making more money than him, and that he thereafter

opposed the plan.  (Id. at 145-46.)  Plaintiff further claims that in or around May

2011, Plaintiff met with Nolan to discuss matters relating to Per Mar's account with Wells Fargo, and that during this meeting, Nolan was very disrespectful to Plaintiff, used foul language, and told Plaintiff to get out of his office. (Fondungallah Decl. Ex. 3 (Plaintiff Dep. at 169); Ex. 15 (Nolan Dep. at 83 (admitting that on one occasion he told Plaintiff to get out of his office, but only after Plaintiff had stormed into his office and slammed the door).)

On or about July 21, 2011, Plaintiff alleges that Nolan came into the control room where Plaintiff and three or four other officers were working.  Nolan allegedly said to them "This isn't welfare, officers aren't going to get a free check to sit on their ass and do nothing."  (Id. Ex. 3 (Plaintiff Dep. at 157).)  Plaintiff told Nolan his comments were offensive and inappropriate, and reported the incident to Human Resources.  (Id.)

Plaintiff claims that other Per Mar employees complained about Ed Nolan as well.  Kenneth Henry complained about Nolan's behavior and his prejudice towards African Americans.  (Id. Ex. 17.)  Later, in an interview with then General Manager Doug Belton, Henry refused to discuss Nolan.  (Id. Ex. 18.)

Another Per Mar employee, Chantelle Bunkley, allegedly complained that Nolan had racially profiled security guards.  Nolan would say that they knew

6

nothing, were stupid and below him.  Bunkley also reported that Nolan wanted

to get rid of Plaintiff because he is black.  (Id. Ex. 23.[1])

On July 26, 2011, Jasmine Brown reported that she had witnessed Nolan

make numerous racist comments.  For example, Nolan questions why only black

people from other countries who could not read and spell were sent to Wells

Fargo, and that he said "No wonder why we can't get shit right it's mainly black

people that work here."  (Id. Ex. 24.[2])

Nolan did not restrict his negative comments to people of color.

(Fondungallah Decl. Ex. 3 (Plaintiff Dep. at 143-43 ("Did you ever see or witness

this Ed Nolan calling a white person stupid or asking them if they were dumb or

that sort of treatment?  A: Oh yeah, I did. I did.")  For example, Alexia Nompeli,

who is white, complained that Nolan was disrespectful to her and her fellow

security officers.  (Id. Ex. 19.)  Nompeli also reported an incident in which Nolan

yelled at her in front of others, and that it made her feel harassed.  When she

complained to management, she was told that Per Mar was in a delicate position

---

[1]This exhibit is an undated memorandum from Bunkley, addressed to "Whom it May Concern."  There is no evidence in the record as to whether this memorandum was given to anyone in Per Mar management.

[2]This exhibit is also in memorandum form.  While it is dated, there is no indication in the record that the memorandum was given to Per Mar management.

with Wells Fargo, and that she would have to do what Nolan told her to do without question.  (<u>Id.</u> Ex. 20.)

John Peaslee, another white employee, complained that Nolan had yelled at him to "shut the fuck up" and that Peaslee felt he was being disrespected.  (<u>Id.</u> Ex. 25; Fondungallah Decl. Ex. 3 (Plaintiff Dep. at 148).)

### 2.     Deb Helmbrecht

On October 29, 2010, Helmbrecht used the term "nigger-rig" during a meeting with Charles Laitinen and Wells Fargo employee Bill Law, who is African American, to describe a procedure used to fix a vehicle.  (Staul Decl. Ex. D (Laitenan Dep. 132-33).)  Nothing was said about the comment during the meeting, but after the meeting, Laitinen approached Law and apologized for Helmbrecht's comment.  (<u>Id.</u> at 133.)  Laitinen then spoke with Tanisha Bradford, Harlan Austin and Per Mar's Vice President Steve Sabatke.  (<u>Id.</u>)  Sabatke told Laitinen to talk with Helmbrecht and tell her the comment was "not okay."  (<u>Id.</u>) Helmbrecht was told to apologize to Bill Law.  (<u>Id.</u> at 134.)

### 3.     Complaints of Disparate Treatment Based on Race

In February 2011, Austin sent an email to Zumdome and Sabatke about his perception of disparate treatment of employees based on race. (Staul Decl. Ex. N.)

One example was the perceived disparate treatment of Helmbrecht and Plaintiff in response to claims of sexual harassment being made against them - in which Plaintiff was suspended during the investigation and Helmbrecht was not.  (Id.) Austin also felt that white employees were treated more favorably than employees of color, specifically referencing the fact that Helmbrecht was not disciplined for using the term "nigger-rig."  (Id.)

In response to this email, Austin met with Zumdome and Per Mar's Chief Operating Officer Dean Guyette in Davenport, Iowa on February 15, 2011. (Zumdome Decl. ¶ 19.)  At this meeting, they discussed Helmbrecht's use of a racially derogatory term and that she was showing favoritism toward certain employees.  (Id.)  Zumdome then issued a formal disciplinary writeup to Helmbrecht regarding her use of the racially derogatory term.  (Id ¶ 20; Ex. J.)  At the meeting, Zumdome also explained to Austin the differences between the two claims of sexual harassment, and that Plaintiff was suspended because the complainant had stated that she feared for her personal safety because of Plaintiff, and that the complainant in the Helmbrecht claim did not assert a fear from his safety.  (Zumdome Decl. ¶ 21.)  Guyette followed up with Austin by email one month later and asked him how things were going, to which Austin

responded that "so far things have been going relatively smoothly.  Thanks for following up with me."  (Fondungallah Decl. Ex. 8 (Austin Dep. at 116, 118).)

In March 2011, Zumdome and Sabatke traveled to Minnesota from Davenport, Iowa, and met with Plaintiff, Austin and Bradford.  (Staul Decl. Ex. A (Plaintiff Dep. at 104-05).)  Zumdome asserts that Plaintiff, Austin and Bradford told her they were satisfied with Per Mar's handling of their concerns of disparate treatment.  (Zumdome Decl. ¶ 22.)

In April 2011, Zumdome dispatched Dan Conroy, Per Mar's Director of Investigations, to Minnesota to conduct a thorough investigation of Helmbrecht's conduct.  (Id. ¶ 23.)  Conroy spent six days in Minnesota over a two week period, and interviewed over two dozen employees.  (Id.)  Conroy forwarded his notes to Zumdome in late May 2011, and in June 2011, Helmbrecht was terminated.  (Id. ¶ 24; Ex. Y; Ex J at 000256.)

### 4.    Investigation into Claims Against Plaintiff and Ed Nolan

In April 2011, Sabatke received a call from Plaintiff, who asked that they meet about Plaintiff's workplace concerns.  (Sabatke Decl. ¶ 14.)  The two met at a fast food restaurant in northeast Minneapolis.  (Id. ¶ 15.)  During the meeting, Plaintiff told Sabatke he had information that would embarrass Per Mar and that

he wanted $100,000 to make the information go away, as well as his complaints about Helmbrecht.  (Id.)  Plaintiff also told Sabatke he knew one of the Presidents of Wells Fargo and that if Wells Fargo learned of the information Plaintiff had, Per Mar would lose the Wells Fargo account.  (Id.)  Sabatke told Plaintiff that Per Mar would not be giving him any money but asked if Plaintiff would work with him to address his concerns.  (Id.)

In May 2011, Zumdome received a call from Plaintiff during which he told her that he had a conversation with Sabatke about workplace concerns, and that he told Sabatke for $100,000, such concerns would go away and that Sabatke had not responded to his demand.  (Zumdome Decl. ¶ 25.)  As Sabatke had not responded to his demand, Plaintiff informed Zumdome that he was now making the same demand to her instead of filing suit.  (Id.)  Zumdome told Plaintiff that she believed Per Mar had done nothing wrong and would not be paying Plaintiff his demand.  (Id. ¶ 26.)  She told Plaintiff she would set up a phone conference with Sabatke and Guyette to address his concerns.  (Id.)  Two days later, Plaintiff called Zumdome and told her to cancel the phone conference, as Plaintiff had decided to go another way.  (Id.)

On June 24, 2011, Per Mar Security Officer Chantelle Bunkley complained

that Plaintiff had failed to address an incident in which Plaintiff's daughter, Per

Mar Security Officer Jasmine English, had pinched Bunkley.  (Id. ¶ 27, Ex. A at

000464, 000466-67.)  Bunkley later withdrew her complaint because Plaintiff had

told her he would address the situation.  (Id.)

One month later, on or about July 26, 2011, Zumdome received an

anonymous call from a female who Zumdome believed to be Bunkley, making

numerous complaints against Plaintiff, including that he showed favoritism to

his daughters, both of whom he supervised, and that he used his position to

threaten employees and that many of Plaintiff's subordinates were afraid for

their jobs.  The anonymous caller further stated that when corporate human

resources routed complaints from Minnesota to Tanisha Bradford, Bradford

would relay the details of the complaint to Plaintiff.  The caller stated that

Bunkley had withdrawn her complaint because Plaintiff had threatened her.

(Zumdome Decl. ¶ 28 (a).)

Around this same time, Zumdome received word from General Manager

Douglas Belton[3] that Ed Nolan had complained that Plaintiff left his shift early on

---

[3]Belton, who is also African American, replaced Harlan Austin as General Manager after Austin resigned his position in April 2011.

several occasions and that he failed to regularly be onsite during second and

third shift to ensure employees were trained properly.  (Id. ¶ 28 (b).)  Later,

Belton called Zumdome, with Plaintiff in his office, to inform her of Plaintiff's

complaint that Nolan swore at Plaintiff and told Per Mar employees to get to

work - that this is not welfare.  (Id. ¶ 28 (c).)  Also on July 26, 2011, Plaintiff went

on medical leave without prior notice.  (Id. ¶ 28 (d).)  Plaintiff later requested,

and was granted, FMLA leave.  (Fondungallah Decl. Ex. A (Plaintiff Dep. at 246).)

On July 29, 2011, Sabatke and Belton met with Nolan to address Plaintiff's

complaints about Nolan's behavior.  During this meeting, Nolan also relayed

concerns he had about Plaintiff, such as not following company policies and not

providing a safe environment for employees.  (Staul Decl. Ex. G (Nolan Dep. at

136).)

Zumdome directed Belton to conduct a comprehensive investigation into

the allegations against Plaintiff and against Nolan.  (Id. ¶ 29.)  Belton conducted

the investigation over a number of days in late July and early August 2011.  (Id.

Ex. A.)  On August 1, 2011, Nolan's manager ordered Nolan to suspend Plaintiff's

badge pending the outcome of an investigation against Plaintiff.  (Staul Decl. Ex.

G (Nolan Dep. at 40, 43).)

Belton talked with Plaintiff, Nolan, Buckley, Alexia Nompeli, Harlan Austin, Security Officer Jacquelyn Cooper, Account Manager Randy Ham-Ying, Security Officer Kenneth Henry, Lead Officer Ray Modig, Security Officer Steve Anderson, Security Officer Michael Pfluger and Second Shift Lead Deonte Robbinson.  Based on these interviews, Belton prepared a report that he submitted to Zumdome.  (Zumdome Decl. Ex. A.)  Plaintiff claims that when the investigation began, he was out on medical leave.  He became aware of the investigation through a letter sent to him from Doug Belton on August 20, 2011. (Fondungallah Decl. Ex. 31.)

In his report, Belton indicated that he spoke with Chantelle Bunkley on July 30, 2011.  (Zumdome Decl. Ex. A at 000466.)  Bunkley explained to him the incident in which Plaintiff's daughter pinched her, and that in response to Bunkley's complaint, Plaintiff told her that he could have Jasmine Brown and his daughters wait for Bunkley after work and beat her up.  (Id.)  Because she felt that she would be in danger if she pursued the matter further, she told Belton that the matter had been resolved.  (Id.)

Bunkley also told Belton that Plaintiff had told her that Tanisha Bradford was his inside person, and that she had forwarded to him lots of Per Mar

14

documents for a lawsuit that he was planning.  (<u>Id.</u> at 000467.)  Bunkley also told

Belton that Plaintiff told her that he was going to take time off by going to his

doctor, and telling him he was stressed out from work.  (<u>Id.</u>)  He was going to use

the time to meet with his attorney about his lawsuit.  (<u>Id.</u>)  Bunkley stated she

was afraid of Plaintiff because he said he would "fuck up" any one who got in

the way of his money.  (<u>Id.</u>)

Belton also interviewed Alexia Nompeli, who told Belton that she had

heard Plaintiff tell employees to "shut up"and that he frequently threatened to

fire employees.  (<u>Id.</u>)  Nompeli told Belton she feared Plaintiff would fire her.

(<u>Id.</u>)  Nompeli also reported that Plaintiff had called her while he was on leave,

and told her to shred a document which indicated his daughter, Cieara English,

had improperly called off for her shift.  (<u>Id.</u> at 000468.)

Belton also interviewed a number of other employees.  None claimed to

have heard Nolan make any racist remarks.  (<u>See</u> <u>Id.</u>)  Based on his investigation,

and the interviews with Per Mar employees, Belton made the following

determinations:

- Lockridge has been absent from work on several occasions
- Lockridge has not worked second and third shift hours as expected
  by the client, Ed Nolan despite Lockridge's statements to myself and

HR Manager Mindy Zumdome to the contrary
- Lockridge did not use proper channels to take leave during July 2011 through August 2011
- Lockridge has authored and posted memorandi (sp) at the data center that contained threatening language
- Lockridge has led a number of Per Mar employees to believe he is planning legal action against Per Mar and Wells Fargo
- Lockridge has used threatening and intimidating language to gain the compliance of his subordinates
- There is no evidence that Ed Nolan has made any racist remarks to or about any Per Mar employees
- There is insufficient evidence to cooborate (sp) Bunkley's claim that Lockridge threatened her with physical harm

(Id. at 000465.)  Belton recommended that based on the evidence gathered during his investigation, Plaintiff be terminated from his employment at Per Mar.  (Id. at 000472.)

Upon review of the investigative report, Zumdome determined that there was no credible evidence that Nolan had made racist remarks to employees and that there was credible evidence that Plaintiff failed to show up for work on several occasions, that he was not training employees and that Plaintiff used threatening and intimidating behavior to gain the compliance of his subordinates and showed favoritism to his daughters and had directed another employee to shred evidence that one daughter, Cieara English, had improperly called off for her shift.  (Zumdome Decl. ¶ 33.)  Based on the results of the investigation,

16

Zumdome decided to terminate Plaintiff's employment.  (Id. ¶ 34.)  Plaintiff was

thereafter terminated on September 19, 2011.  (Staul Decl. Ex. E (Belton Dep. at

79).)

In this action, Plaintiff has asserted a number of claims: race discrimination

and retaliation under Title VII, Section 1981 and the Minnesota Human Rights

Act.  He also asserted a claim for interference under the Family Medical Leave

Act and a claim for intentional infliction of emotional distress ("IIED").  Plaintiff

is not proceeding with the IIED claim.  (See Pl.'s Opp. at 51.)

## II.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

17

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## III. Argument

### A. Race Discrimination

The elements of a prima facie case of race discrimination are 1) Plaintiff is a member of a protected group; 2) he was meeting Per Mar's legitimate expectations; 3) he was discharged; and 4) the discharge occurred in circumstances that give rise to an inference of unlawful discrimination. Riser v. Target Corp., 458 F.3d 817, 819-20 (8th Cir. 2006).

If Plaintiff meets his burden of demonstrating a prima facie case, the burden shifts to Per Mar to articulate a legitimate, non-discriminatory reason for his termination. Once this showing is made, the burden then shifts back to Plaintiff to show Per Mar was likely motivated by a discriminatory reason or that Per Mar's explanation was unworthy of credence. Reeves v. Sanderson Plumbing Prod. Line., 530 U.S. 133, 142-43 (2000). "'The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of

18

intentional discrimination.'"   <u>Id.</u> at 147 (quoting <u>St. Mary's Honor Center v.</u>

<u>Hicks</u>, 509 U.S. 502, 511 (1993)).

Assuming without deciding that Plaintiff has put forth a prima facie case

of disparate treatment, the Court finds that Per Mar is entitled to summary

judgment as Plaintiff has failed to demonstrate a genuine dispute as to pretext or

intentional discrimination.

       1.     **Pretext**

       a.     **Suspension**

The Court finds that Plaintiff has failed to demonstrate that Per Mar's

decision to suspend him pending the investigation into a complaint of sexual

harassment is a pretext for discrimination.  The record is undisputed that

Zumdome and Mortenson made the decision to suspend Plaintiff during the

investigation only after they learned that the claimant had alleged that she was in

fear for her personal safety from Plaintiff.  (Zumdome Decl. ¶ 7; Staul Decl. Ex.

L.)  The record is also undisputed that with respect to the complaint of sexual

harassment against Helmbrecht, the claimant did not allege fear for his personal

safety.  (<u>Id.</u> ¶ 13.)

With respect to Plaintiff's assertions that Helmbrecht was not counseled

following the sexual harassment complaint against her, the Court finds there is

evidence in the record that Helmbrecht was subjected to disciplinary action and

training. (See Fondungallah Decl. Ex. 9.) In addition, as evidenced by a

counseling report issued to Helmbrecht on November 1, 2010, management had

met with Helmbrecht on "several occasions to discuss [] job expectations and

provide coaching and guidance regarding [Helmbrecht's] performance." (Staul

Decl. Ex. J.) Specifically, Helmbrecht was counseled regarding payroll errors,

professionalism, and communication with the branch office. (Id.) Further,

because Helmbrecht had not shown improvement, she was placed on a 60 day

performance plan. (Id.) Ultimately, Helmbrecht was terminated in June 2011.

### b.   Termination

Per Mar asserts the decision to terminate Plaintiff's employment based on

the result of a detailed investigation into complaints against both Plaintiff and

Nolan. Based on that investigation, Per Mar obtained evidence to sustain

findings that Plaintiff had failed to show up for work on multiple occasions, that

he was not training employees as he was required to do, he was using

threatening and intimidating behavior to gain compliance from subordinates and

was showing favoritism to his daughters who worked under his direction. (See

Zumdome Decl. Ex. A.)

Plaintiff argues there is insufficient evidence to support the claim that Plaintiff used fear and intimidation to gain compliance of subordinates. Specifically, the only employee that reported she felt threatened by Plaintiff was Chantelle Bunkley, but the evidence shows that Bunkley told General Manager Doug Belton that she was actually afraid that Plaintiff's daughters would beat her up - not that Plaintiff would beat her up.  The only other piece of evidence to support this claim is that Plaintiff was heard to have told an employee to "shut up."

Contrary to Plaintiff's claims, there is evidence in the record which shows that Plaintiff used fear and intimidation to gain compliance with subordinates. For example, Zumdome states in her declaration that she received a phone call on or about July 26, 2011, whom she believed to be Ms. Bunkley, and that the caller stated Plaintiff showed favoritism to his daughters and used his position to threaten employees. (Zumdome Decl. ¶ 28(a).)  The caller further told Zumdome that when employees complaints were routed from Minnesota to corporate, Tanisha Bradford would relay the details of the complaint to Plaintiff, and as a result, Ms. Bunkley withdrew her June 24, 2011 complaint because Plaintiff

threatened her.  (Id.)

        In addition, during his investigation of complaints against both Plaintiff

and Ed Nolan, Bunkley told Belton that Plaintiff threatened her by stating he

could have his daughters and another Per Mar employee "wait for Bunkley after

work and beat her up."  (Id. Ex. A at 000466.)  Bunkley also told Belton that "[a]t

this point [she] felt she would be in danger if she pursued the matter any further

so she called [Belton] and told [Belton] the matter had been resolved."  (Id.)

Bunkley also told Belton that Plaintiff would "fuck up" anyone that got in the

way of his money from the lawsuit he planned to bring against Per Mar.  (Id. at

000467.)  During his investigation, Belton also talked with Per Mar Security

Officer Jacquelyn Cooper, who told Belton that Plaintiff was trying to get

Bunkley fired.  Plaintiff also told Cooper that if he ever saw Cooper speaking

with Bunkley, he would have her fired.  (Id.)

        While Belton did speak with other Per Mar employees who told him that

they believed Plaintiff was fair to all employees, the fact remains that two

employees did report to Belton that they were threatened by Plaintiff and were

intimidated by him.

        Plaintiff also challenges the assertions regarding his work attendance and

failure to train employees.  In support, he cites to the unsigned letters of Chuck

Laitinen and Harlan Austin that are dated after Plaintiff had already been

terminated.  (Fondungallah Decl. Exs. 32 and 33.)  Plaintiff also questions the

timing of Ed Nolan's complaints about Plaintiff, as they were not raised until

after Plaintiff had complained about him and even though the investigation

uncovered evidence that Nolan did make racist comments, such as "people from

other countries should go back to where they come from" Belton nonetheless

concluded that no evidence was discovered that Nolan had made racist

comments.

As evidenced in the "Conclusion" section of his investigative report, Belton

found no evidence that Nolan made any racist or racially offensive remarks to or

about any Per Mar employee.  (Zumdome Decl. Ex. A at 000472.)  He did,

however, recognize that Nolan made a number of unguarded and unflattering

comments, including the comment that "people from other countries should go

back where they come from."  (Id.)  Belton noted that he found no evidence that

any Per Mar employee took Nolan's comments as verbal assaults motivated by

race.  (Id.)

Plaintiff further asserts that Per Mar did not confront Ed Nolan with the

complaints that he made racist comments.  However, Nolan testified at his

deposition that he was made aware that allegations were made against him that

he had made racist comments when he met with Sabatke and Belton on July 29,

2011.  (Staul Decl. Ex. G (Nolan Dep. at 135).)

Finally, Plaintiff challenges Per Mar's claim that he ordered documents

shredded to cover up the fact that one of his daughters had improperly missed

work and that she tried to cover it up.  Plaintiff alleges that this report came from

Alexia Nompeli, and that Nompeli was lying about the incident because she was

trying to replace Plaintiff as account manager. (Fondungallah Decl. Ex. 3 (Plaintiff

Dep. at 277).)  There is no evidence in the record, however, which shows that

Belton had any reason to doubt Nompeli's credibility when she told him that

Plaintiff ordered her to destroy documents concerning his daughter's work

attendance.  See Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1003

(8th Cir. 2012) (finding that a showing that the employer made a mistaken and

unreasonable determination that an employee violated company rules does not

prove that the employer was motivated by intentional discrimination); Pye v. Nu

Aire, Inc., 641 F.3d 1011, 1022 (8th Cir. 2011) (recognizing that "[a] proffered

legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination.").

To show pretext, Plaintiff further asserts there is evidence in the record that similarly situated non-African American employees were treated differently. Employees are similarly situated "when they are involved in or accused of the same offense and are disciplined in different ways." Riser, 458 F.3d at 821. With respect to this case, an employee is similarly situated if he/she was not subjected to an internal investigation or terminated, even though that employee failed to show up for work on multiple occasions, failed to perform assigned work duties, such as training new employees, and engaged in threatening and intimidating behavior to gain the compliance of subordinates.

The Court has reviewed Plaintiff's comparator evidence and finds that Plaintiff has failed to present evidence that similarly situated non-African American employees were treated differently for committing the same "offenses" as Plaintiff.  For example, Plaintiff claims that a white employee, Mike Erdmann, was found to have committed time fraud on many occasions.  Rather than facing immediate termination, this employee was allowed to resign.  (Fondungallah

Decl. Ex. 8 (Austin Dep. at 138).)  The record does not demonstrate that Erdmann

engaged in threatening or intimidating behavior or that he failed to perform

assigned duties.  Plaintiff further claims that a white employee named Tim

Jensen was found using a company camera to take pictures of his private parts

and those of a client's employee.  Austin recommended he be fired, but Jensen

was allowed to resign.  (Id. at 140-41.)  Again, the record does not demonstrate

that Jensen engaged in the same type of conduct for which Plaintiff was

terminated.

Plaintiff also claims that a Latino employee, Chester Spears, was

immediately terminated for falsifying his time records, and that a white

employee, Mary Verness, was late to work on multiple occasions, yet she

continues to work for Per Mar.  In support, Plaintiff cites to the deposition of

Harlan Austin, but Austin specifically testified that he did not know Spears or

the allegations surrounding his termination.  (Id. at 139-40.)  With respect to

Mary Verness, Austin testified that the issue with Verness concerned her sharing

confidential information on Deb Helmbrecht with Alexia Nompeli, not that she

was late to work.  (Id. at 149-50.)  Unsubstantiated deposition testimony that

similarly situated white employees were treated more favorably does not create a

genuine dispute on pretext or intentional discrimination.  Davenport v.

Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994).

Because Plaintiff has failed to demonstrate there are genuine issues as to

whether Per Mar's articulated reasons for his termination are a pretext for

intentional discrimination, Per Mar is entitled to summary judgment on

Plaintiff's claims of disparate treatment.

**B.    Retaliation/Reprisal**

"To defeat summary judgment on a retaliation claim, a plaintiff must

produce either direct evidence of retaliation, or create an inference of retaliation

under the McDonnell Douglas burden-shifting framework." Pye, 641 F.3d at 1020

(quoting Young–Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir.

2011) (citation omitted)).

**1.    Prima Facie Case**

The elements of a prima facie claim for retaliation under Title VII are: "(1)

[Plaintiff] engaged in protected conduct, (2) [Plaintiff] suffered a materially

adverse employment action, and (3) the adverse action was causally linked to the

protected conduct."  Pye, 641 F.3d at 1021.

Plaintiff alleges that he engaged in protected conduct when he repeatedly

opposed race discrimination and harassment directed at him by Per Mar and Ed

Nolan.  He asserts that within the first year of his employment with Per Mar, he

complained to Chuck Laitinen that Nolan used racially derogatory language.

(Fondungallah Decl. Ex. 3 (Plaintiff Dep. at 130-31).)  Plaintiff further asserts that

in 2011, he complained to Harlan Austin when allegations of sexual harassment

were brought against him.  (Id. at 129.)  He notes that prior to the sexual

harassment claim made against him, Plaintiff had never been disciplined by Per

Mar.

On or about July 25, 2011, Plaintiff complained to Belton and Zumdome

that Nolan made racist remarks to Per Mar employees in Plaintiff's presence,

referring to the comment that people from other countries should go back to

where they came from, and the comment that "this isn't welfare."  (Fondungallah

Decl. Ex. 3 (Plaintiff's Dep. at 157, 160; Ex. 16 (Belton Investigative Report ¶ 2).)

Plaintiff asserts that it was only after he made the complaint against Nolan that

Nolan raised any concerns about Plaintiff's performance.  Per Mar then

conducted an investigation while Plaintiff was out on medical leave and less than

two months after making a complaint against Nolan, Plaintiff was terminated.

Plaintiff argues that the circumstances and timing of his termination warrant an

inference of retaliatory motive.

As set forth above, the Court finds that intervening events were involved in the decision to terminate Plaintiff, namely the complaint of several employees about Plaintiff which led to an investigation into concerns that Plaintiff was, among other things, threatening and intimidating employees and was not performing his duties.  See Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852 (8th Cir. 2005) (finding intervening events erodes causal connection based on temporal proximity); Freeman v. Ace Telephone Assoc., 467 F.3d 695 (8th Cir. 2006) (same).

As a whole, the Court finds that the evidence is insufficient to permit a reasonable jury to draw an inference that Per Mar unlawfully retaliated against him for engaging in protected activity.  Montes v. Greater Twin Cities Youth Symphonies, 540 F.3d 852, 859 (8th Cir. 2009).

## C.     Racially Hostile Work Environment

To succeed on this claim, Plaintiff must prove that 1) he was a member of a protected group; 2) he was subject to unwelcome harassment; 3) the harassment was based on his race; 4) the harassment affected a term, condition or privilege of employment; and 5) that Per Mar knew or should have known of the harassment

and failed to take prompt and remedial action.  See Sutherland v. Missouri Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009); Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000).  "Hostile work environment harassment occurs when 'the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Palesch, 233 F.3d at 566 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  The Court must keep in mind that "[n]ot all unpleasant conduct creates a hostile work environment.  Rather, the plaintiff must show that []he was singled out because of []race, and that the conduct was severe and pervasive."  Id. (quoting Williams v. City of Kansas City, Missouri, 223 F.3d 749, 753 (8th Cir. 2000)).

Plaintiff claims he was subjected to racially derogatory comments from Ed Nolan about welfare, being yelled at by Nolan, denial of leadership opportunities, differential treatment, suspension, fabricated counseling reports and false and unsubstantiated violations of company policy.

Plaintiff further argues that other employees complained to management about Nolan's racist attitude and comments, and instead of responding to these

complaints, Per Mar succumbed to Wells Fargo's demands and began a bogus

investigation to find reasons to fire Plaintiff.

The Court finds that Plaintiff has failed to demonstrate the existence of fact

questions as to whether he was subjected to actionable harassment.  By his own

admission, Nolan's offensive comments were not restricted to people of color.

For example, the "welfare" comment was made in the presence of both white and

black employees.  Plaintiff himself characterized Nolan as rude and aggressive

toward any employee that was below him, and that over the six year period

Plaintiff worked for Per Mar, he heard Nolan make racist comments only five or

six times.  (Fondungallah Decl. Ex. 3 (Plaintiff Dep. at 135-36, 148-49).)  The Court

further notes that Plaintiff admitted that Nolan's abrasive management style

applied to all races, and that he had a complex about people underneath him.

(Fondungallah Decl. Ex. 3 (Plaintiff Dep. at 135-36) ("I think Ed Nolan was racist,

but I think Ed Nolan also had just a complex on his shoulder about people

underneath him.  So just because you was black, he'd tell you your black things,

but if you were white he'd disrespect you too and treat you like crap.")

The Court further finds that Plaintiff has not demonstrated facts questions

as to whether Per Mar failed to take prompt, remedial action once it was notified

of Plaintiff's complaints.  With respect to the comment made by Deb Helmbrecht,

the record demonstrates that management met with Austin, Bradford and

Plaintiff in Iowa, and thereafter traveled to Minnesota to again meet with them.

The record also demonstrates that Per Mar conducted a comprehensive

investigation into the complaints against Helmbrecht, and that based on that

investigation, Helmbrecht was terminated.

With respect to Nolan, the record demonstrates that an investigation was

commenced right after management was made aware of Plaintiff's complaints

about Nolan.  The fact that the investigation also looked into complaints against

Plaintiff does not invalidate the investigation against Nolan.

Per Mar is thus entitled to summary judgment on the claim that Plaintiff

was subjected to a hostile work environment.

### D.    FMLA Interference

Under the FMLA, it is "unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided

[thereunder]."  29 U.S.C. § 2615(a)(1).  To prove an interference claim, Plaintiff

must show that he was denied substantive rights under the FMLA for a reason

connected with FMLA leave.  Ballato v. Comcast Corp., 676 F.3d 768, 772 (8th Cir.

2012).  Plaintiff has the initial burden of showing that he was entitled to a benefit

denied.  Id.  If this showing is made, the burden shifts to the employer to show

there was a reason unrelated to the Plaintiff's exercise of FMLA rights for

terminating employment.  Id.  "If the employer can prove that it would have

terminated the employee had the employee not exercised FMLA rights, the

employer will not be liable."  Id.

Here, the evidence is undisputed that Plaintiff requested, and was granted,

FMLA leave.  Plaintiff argues, however, that he was entitled to reinstatement

after his leave and that Per Mar interfered with that right when it terminated his

employment.  "However, the mere fact of discharge during FMLA leave by no

means demands an employer be held strictly liable for violating the FMLA's

prohibition of interfering with an employee's FMLA rights."  Throneberry v.

McGehee Desha County Hosp., 403 F.3d 972, 980 (8th Cir. 2005).

The Court finds that Plaintiff should not be shielded from wrongdoing

simply because he was on FMLA leave.  Plaintiff has failed to demonstrate

material fact questions exist that the real reason he was terminated was because

he was exercising his rights under the FMLA.  Accordingly, the Court finds that

summary judgment as to Plaintiff's interference claim is also warranted.

IV.     **Motion to Exclude Expert Report**

Per Mar retained Suanne Grobe Ranheim as an expert witness to prove that Plaintiff did not adequately mitigate his damages during the almost two years following his termination by Per Mar.  Because the Court finds that Per Mar is entitled to summary judgment as to all claims asserted against it, the motion to strike Ranheim's expert testimony is moot.

**IT IS HEREBY ORDERED:**

1.      Defendant Per Mar Security & Research Corp.'s Motion for Summary Judgment [Doc. No. 63] is GRANTED;

2.      Plaintiff's Motion to Exclude Expert Testimony [Doc. No. 52] is DISMISSED AS MOOT; and

3.      This matter is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Date:   September 15, 2014

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court